# IN THE SUPREME COURT OF TEXAS

═══════════

No. 11-0050

═══════════

FPL ENERGY, LLC, FPL ENERGY PECOS WIND I, L.P.,
FPL ENERGY PECOS WIND II, L.P., AND INDIAN MESA WIND FARM, L.P.,
PETITIONERS,

V.

TXU PORTFOLIO MANAGEMENT COMPANY, L.P.
N/K/A LUMINANT ENERGY COMPANY, LLC, RESPONDENT

═══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════════════

**Argued October 15, 2012**

JUSTICE GREEN delivered the opinion of the Court.

In this contract interpretation case, TXU Portfolio Management Company, L.P. (TXUPM) contracted to receive electricity and renewable energy credits (RECs) from wind farms owned by FPL Energy, LLC. FPL failed to provide the required electricity and RECs. TXUPM sued FPL for breach of contract; FPL counterclaimed, arguing TXUPM failed to provide FPL with sufficient transmission capacity. The trial court granted two partial summary judgments. First, it issued a declaratory judgment that the contracts required TXUPM to provide transmission capacity. Second, it declared the contracts' liquidated damages provisions unenforceable. The remaining issues were

tried to a jury, and the trial court entered take-nothing judgments for both parties. Both parties appealed. The court of appeals reversed both summary judgment rulings. 328 S.W.3d 580, 591 (Tex. App.—Dallas 2010, pet. granted).

We address the following issues: (1) did TXUPM owe FPL a contractual duty to provide adequate transmission capacity to FPL; (2) if FPL breached and TXUPM did not, do the liquidated damages provisions apply to energy *and* RECs or only to RECs; and (3) are the liquidated damages provisions in these contracts enforceable? We affirm the court of appeals' holding that TXUPM owed no contractual duty to provide transmission capacity. However, we hold the liquidated damages provisions apply only to RECs and are unenforceable as a penalty. Accordingly, we reverse the court of appeals' judgment in part and remand the case to the court of appeals to determine damages.

## I. Factual and Procedural Background

In Texas, the electric industry consists of three main components: power generation, power transmission, and power distribution. Electric producers own and operate generating facilities. The Electric Reliability Council of Texas, Inc. (ERCOT), with few exceptions, manages the transmission of electricity through an interconnected network—or grid—of transmission lines. Finally, retail electric providers distribute electricity directly to consumers.

In 1999, the Legislature created ambitious goals for renewable energy in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, sec. 39.904, 1999 Tex. Gen. Laws 2543, 2598–99. The Legislature charged the Public Utility Commission of Texas (PUC) with establishing minimum renewable energy production requirements for all Texas electric providers. TEX. UTIL. CODE

§ 39.904(c)(1). The Legislature also tasked the PUC with establishing a REC trading program. *Id.* § 39.904(b). A REC reflects one megawatt hour (MWh) "of renewable energy that is physically metered and verified in Texas." 16 TEX. ADMIN. CODE § 25.173(c)(13). Electric producers thus simultaneously create both electricity from renewable sources and the corresponding RECs, yet producers may choose to sell the two separately. *Id.* § 25.173(d). The REC trading program allows electric providers unable to satisfy the minimum renewable energy requirements to purchase and hold RECs "in lieu of capacity from renewable energy technologies." TEX. UTIL. CODE § 39.904(b); *see* 16 TEX. ADMIN. CODE § 25.173(d)(2).

TXU Electric, a retail electric provider (and a different entity than TXUPM), solicited proposals from renewable energy producers to meet the new renewable energy production requirements. In 2000, TXU Electric entered agreements with two wind farm subsidiaries of FPL: Pecos Wind I, L.P. and Pecos Wind II, L.P. Also in 2000, FPL acquired a third party's rights to a similar contract with TXU Electric for Indian Mesa Wind Farm, L.P. Under the contracts, FPL sells TXU Electric RECs and the renewable electric energy used to produce those credits. TXU Electric assigned the contracts to TXUPM, a power marketer and, importantly, not a retail electric provider. The contracts with Pecos Wind I and II are identical. The Indian Mesa contract largely contains the same provisions, but, as explained below, the parties point to relevant differences in support of their claimed intent at the time of contracting. Two provisions of these contracts give rise to this dispute: one provision governing TXUPM's transmission responsibilities and one providing for liquidated damages in the event that FPL fails to meet certain production requirements.

3

For approximately four years, FPL failed to produce the agreed upon electricity and RECs. TXUPM filed suit seeking damages for FPL's breach of the contracts. FPL counterclaimed, arguing that it could not meet its obligations because of congestion on the ERCOT grid. When the grid lacks capacity to transmit all energy produced in an area, ERCOT issues curtailment orders instructing certain facilities to cease production. FPL claims it received curtailment orders from ERCOT which, along with an unexpected lack of wind in the area, caused it to produce less energy than promised. FPL blamed the congestion and resulting curtailment orders on TXUPM, insisting that TXUPM bore responsibility to ensure transmission capacity for all energy FPL could produce.

Both parties filed motions for partial summary judgment. Each sought declaratory judgment to clarify the portions of the contracts relating to transmission capacity and liquidated damages. The trial court issued several rulings. First, the court declared that the contracts unambiguously required TXUPM to provide all transmission services, including transmission capacity, to FPL. Second, the court determined that the liquidated damages provisions in the contracts were not enforceable, and thus void, because a liquidated damages amount of $50 per REC was not a realistic forecast of damages.

Consistent with these rulings, the trial court's instructions to the jury indicated that TXUPM was required to provide transmission capacity and that the liquidated damages were unenforceable. The jury found that TXUPM should receive $8.9 million in compensatory damages for FPL's failure to deliver renewable energy, yet the jury determined that TXUPM secured cover for the missing electricity by acquiring substitute electricity. The jury also found that TXUPM owed no compensatory damages to FPL for TXUPM's alleged failure to ensure transmission capacity. The

4

trial court entered judgment on the jury's verdict, ordering that (1) FPL take nothing on its claims; and (2) TXUPM take nothing, despite the jury's damage award, because TXUPM covered.

The court of appeals affirmed the take-nothing judgment for the damages claims but reversed and rendered judgment on the issues related to declaratory relief. 328 S.W.3d at 591. The court held that the contracts did not require TXUPM to provide the necessary transmission capacity. *Id.* at 587. As to liquidated damages, the court of appeals held that the provisions were enforceable because damages were difficult to estimate, the $50 rate was a reasonable estimate of just compensation, and FPL could not meet its burden to show that the $50 rate was disproportionate to TXUPM's actual damages. *Id.* at 587–90.

We granted FPL's petition for review and address the three issues before us—whether TXUPM was responsible for ensuring transmission capacity, whether the liquidated damages provisions apply to failure to deliver electricity, and whether the liquidated damages provisions are enforceable. 55 Tex. Sup. Ct. J. 320 (Feb. 17, 2012).

## II. Contract Interpretation

Before deciding the enforceability of the liquidated damages provisions, we must resolve two matters of contract interpretation—TXUPM's responsibility for transmission capacity and the scope of the liquidated damages provisions. Our analysis begins with the legal question of the contracts' ambiguity. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). If we can give a clear and definite legal meaning to a contract, it is not ambiguous as a matter of law. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010). An ambiguous contract, however, has a doubtful or uncertain meaning or is reasonably

susceptible to multiple interpretations; we will not find ambiguity simply because the parties disagree over a contract's meaning. *Dynegy Midstream Servs.*, 294 S.W.3d at 168. Our primary concern in contract interpretation is to "ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We consider the entire writing to harmonize and effectuate all provisions such that none are rendered meaningless. *Id.* Further, we "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

## A. Transmission Capacity

We first consider whether the contracts require TXUPM to provide adequate transmission capacity to FPL. The trial court and the court of appeals found section 2.03 unambiguous, a finding the parties do not challenge. 328 S.W.3d at 584–85. We may, nonetheless, declare a contract ambiguous, *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231 (Tex. 2003), but we hold that section 2.03, when construed in light of the entire contracts, has a definite legal meaning and, thus, is unambiguous. *See Gilbert Tex. Constr.*, 327 S.W.3d at 133.

Section 2.03(a) of the contracts, entitled "Transmission," reads as follows:

TXU Electric shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses except for line losses on [FPL's] side of the Delivery Point, and transaction fees, necessary to deliver Net Energy to TXU Electric's load from the Renewable Resource Facility throughout the Contract Term ("Required Transmission Services").

6

Section 1.02(a) of the contracts defines "Net Energy" as "the amount of electric energy in MWh produced by the Renewable Resource Facility and *delivered to the Connecting Entity*." (emphasis added). Under section 2.02, a Connecting Entity owns any "transmission or distribution system with which the Renewable Resource Facility is interconnected." The Connecting Entity serves as the "Delivery Point."

FPL urges a broad view of TXUPM's responsibility for transmission services. FPL contends that TXUPM's obligation to provide transmission services "without limitation" encompasses the *capacity* to deliver electricity from the Renewable Resource Facility (i.e. FPL) to the load (i.e. TXUPM's customer base). In support, FPL argues that Net Energy can refer only to a quantity and has no bearing on how and when delivery occurs. FPL further argues that the more specific language, "from the Renewable Resource Facility," should trump Net Energy, which is defined elsewhere in the contracts. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (stating the rule that, in contract interpretation, a more specific provision will control over a general statement). FPL points to congestion beyond the Delivery Point, explaining that as electricity is generated and delivered virtually simultaneously, it cannot stop and wait at the Delivery Point for congestion to clear. In a compelling visual, FPL suggests that the transmission towers might burn down if FPL generated and sent electricity without an available, guaranteed path to the consumer. FPL complains that TXUPM caused the grid congestion and thus prompted the resulting curtailment orders.[1]

---

[1] The record shows that FPL earlier claimed that TXUPM: (1) prioritized its own fossil fuel-derived energy; (2) knowingly overstated to ERCOT its intention to transmit fossil fuel energy, resulting in curtailment orders for wind-produced energy; and (3) exercised its authority as a "Qualified Scheduling Entity," whose responsibility is to report

TXUPM interprets the contracts as placing the risk of transmission system incapacity on FPL. TXUPM notes that the contracts identify "lack of transmission capacity" as an "Uncontrollable Force" outside the reasonable control of the parties. If capacity is beyond the control of the parties, TXUPM questions, how then can TXUPM bear responsibility for failure to provide capacity? Section 4.05 of the contracts reinforces this point by making clear that FPL must pay liquidated damages for failure to supply RECs *even if* the failure was the result of inadequate transmission capacity. Finally, TXUPM argues that the contracts' definition of Net Energy binds this Court; incorporating Net Energy, as defined, into section 2.03 means that TXUPM owes a duty to provide transmission services *only* after the Delivery Point. Under TXUPM's interpretation, if FPL could not deliver electricity because of congestion, FPL bore the risk and, thus, must bear the consequences. We agree with TXUPM's interpretation.

We begin by recognizing the apparent textual conflict. Read in isolation, section 2.03 contains language supportive of either a broad or narrow interpretation of TXUPM's transmission service responsibilities. "[F]rom the Renewable Resource Facility" implies that TXUPM would have to secure transmission capacity so FPL could deliver electricity. But the use of the term Net Energy, which exists only upon FPL's delivery to the Connecting Entity, suggests that TXUPM

___

anticipated electricity generation to ERCOT, to influence ERCOT's schedule for energy transmission on the grid. FPL's briefs, however, do not pursue these arguments. FPL petitioned this Court to review the meaning of the contracts as to TXUPM's obligations to provide transmission services, not TXUPM's alleged role in creating congestion. Thus, we will not consider these arguments. *See Guitar Holding Co., L.P. v. Hudspeth Cnty. Underground Water Conservation Dist. No. 1*, 263 S.W.3d 910, 918 (Tex. 2008) (holding issues waived if not presented in the petition for review or in the briefs).

bears responsibility only if the grid possesses capacity for TXUPM to deliver any generated electricity.

We cannot interpret a contract to ignore clearly defined terms, *see Frost Nat'l Bank*, 165 S.W.3d at 313, and, thus, we must accord Net Energy its due meaning. The contracts assigned TXUPM responsibility only for transmission services required to deliver Net Energy, and Net Energy represents the amount of energy produced by FPL *and* delivered to the Connecting Entity. TXUPM's responsibility for transmissions services, then, begins once FPL-generated electricity reaches the Connecting Entity on the grid—the Delivery Point. The contracts' use of the phrase "from the Renewable Resource Facility" is simply a designation of where the energy originated. It does not alter the definition of Net Energy provided in section 1.02 or in other sections throughout the contracts.

The placement of section 2.03 in the context of all interconnection requirements reinforces this conclusion. Section 2.02 requires FPL to "make all arrangements . . . necessary to interconnect . . . with a transmission or distribution system," i.e. the Connecting Entity. Transmission systems are owned and operated by transmission service providers. *See* 16 TEX. ADMIN. CODE § 25.5(143), (144). As between the original contracting parties, the contracts required a separate agreement to address interconnection if TXU Electric was the connecting entity; the parties do not suggest any such agreement exists. Between TXUPM and FPL, no such agreement can exist because TXUPM, as a power marketer, cannot own transmission systems. *See id.* § 25.5(83) (defining "power marketer" to exclude owners of transmission systems). The contracts obligate FPL to secure interconnection with a Connecting Entity, or transmission service provider,

9

which under the PUC rules cannot be TXUPM. *See id.* § 25.5(83), (143). Reading sections 2.02 and 2.03 together, FPL must make all interconnection arrangements so that electricity can reach the Delivery Point, and TXUPM must ensure that facilities exist beyond the Delivery Point to allow for delivery to consumers. These provisions do not speak to the situation here, where both parties claim to meet their responsibilities but congestion on the grid inhibits energy generation and delivery.

Given these facts, then, we must consider which party is responsible for congestion beyond the Delivery Point. While FPL blames grid congestion on TXUPM, we believe the contracts recognize such congestion as beyond both parties' control. Section 6.02(a) of the contracts addresses "Uncontrollable Force," including "[e]vents or circumstances that are outside of a Party's reasonable control," which "may include . . . lack of transmission capacity or availability." The contracts mention transmission capacity only in this section. Congestion and curtailment issues, which affect transmission capacity and availability, must fall within this provision. Section 6.02(b) goes on to excuse a party from performance in the event of an Uncontrollable Force if certain criteria are met; there is no dispute that FPL did not meet those criteria.

Section 4.05, entitled "Effect of Outages and Uncontrollable Force," outlines the general rule that payment and other calculations in sections 4.01–.10 *are not* impacted by Uncontrollable Force. The exception to this rule, discussed below, applies to reduce the Annual Quantity of RECs that FPL must produce for TXUPM only when PUC substantive rules would excuse the shortfall. The exception does not excuse FPL from its obligation to deliver electricity. In essence, the contracts allocate the risk of curtailment and congestion to FPL by clearly establishing that such events affect contract obligations only in certain instances not found here. We must respect and enforce this

10

assignment of risk.  *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

To summarize, the contracts obligate FPL to interconnect with a Connecting Entity, which cannot be TXUPM.  TXUPM bears responsibility for providing transmission services from the Delivery Point at the Connecting Entity.  To the extent that lack of transmission capacity impairs electricity generation at the wind farms, the contracts provide that such lack of capacity is an Uncontrollable Force and FPL, therefore, bears the risk.

We note that this analysis does not fail because of the unique nature of electricity, despite FPL's assertions.  Admittedly, electricity generation, transmission, and distribution occur almost simultaneously.  But even if electricity moves too fast to pinpoint its physical location, the parties certainly can conceptualize its location for the purpose of creating energy contracts like the ones in question today.  Several contractual provisions make this clear: section 2.03(a) assigns FPL responsibility for any loss of electricity on its side of the Delivery Point; and section 3.01(b) makes FPL responsible for maintenance and operational compliance with ERCOT guidelines for facilities up to the Delivery Point.  This conceptualization of electricity's location pervades the contracts, and the parties assigned different responsibilities and liabilities based upon that understanding.

Here, ERCOT issued curtailment orders, effectively constraining energy generation, rather than energy transmission.  FPL was therefore prevented from generating electricity and meeting its contractual obligations.  Although ERCOT made final curtailment decisions, that does not mean that neither party bore the risk in the event of congestion and curtailment.

11

We hold that the contracts did not require TXUPM to provide transmission capacity for FPL but rather allocated risk of inadequate transmission capacity to FPL.

## B. Liquidated Damages

We next consider the breadth of the liquidated damages provision in section 4.04. The court of appeals did not address the ambiguity of the section, and neither party argues the provision is ambiguous. We conclude that the provisions are unambiguous because we may discern a definite legal meaning by construing the provisions in light of each contract as a whole. *See Gilbert Tex. Constr.*, *L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010).

The provisions state in relevant part:

> If there is a Net Deficiency for a year . . . . [FPL] shall pay [TXUPM] a Deficiency Payment equal to the product of (i) the difference in MWh between (a) the Net Deficiency, and (b) the MWh of Transferred RECs, times (ii) the Deficiency Rate. The Deficiency Payment is intended to be liquidated damages and not a penalty.

Vastly simplified, a Net Deficiency occurs when FPL fails to meets its "Annual Quantity" REC quota, even taking into account past overproduction.

Section 4.04(f) sets the Deficiency Rate as follows:

> The initial Deficiency Rate is $50 per MWh, based upon the $50 per MWh number in [PUC] Substantive Rule § 25.173. If the $50 per MWh in that Rule is amended, then the Deficiency Rate is automatically adjusted to the amended number stated in that Rule. If [PUC] Substantive Rule §25.173 is amended or repealed without replacement so that the $50 number is no longer in the [PUC] Substantive Rules, then the Deficiency Rate is $50. To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC] . . . . For a year for which there is a Deficiency Payment due, [TXUPM] shall make reasonable efforts to obtain a determination of the annual average market value of RECs by the [PUC], but nothing

12

in this Section or in this Agreement obligates [TXUPM] to turn in fewer RECs than are required of it by the [PUC] program administrator in order to obtain such a determination.

TXUPM argues that the contracts cover both energy and RECs, and, therefore, the liquidated damages clauses must apply to both. TXUPM reads subsections (d) and (f) in the context of contract Article IV (sections 4.01–.10), entitled "Payment, Records, and Billings." According to TXUPM, because FPL simultaneously produces RECs and energy, the parties simply use RECs as a counting mechanism for both, rather than a term limited strictly to RECs. In support, TXUPM references section 4.02, which provides the contracts' payment terms, whereby TXUPM must pay FPL a unified price for an Annual Quantity of MWhs of Renewable Energy comprised of both energy and RECs. Sections 4.03 and 4.04(a)–(c) outline a quarterly and annual reconciliation process to smooth any discrepancies based on the differences between continuous production of electricity and the quarterly issuance of RECs. Section 4.04(d), the argument goes, necessarily incorporates the language used in the other sections. That section states: "[FPL] may elect to obtain and transfer RECs to [TXUPM] that were not produced at the Renewable Resource Facility to completely or partially offset the Net Deficiency . . . not to exceed the sum of (i) 20% of the Annual Quantity, and (ii) the Uncontrollable Force Deficiency for that year." Thus, TXUPM argues, Section 4.04(d) as a whole must refer to the Annual Quantity of both energy and RECs.

In response, FPL points to the absence of "Net Energy" or "Renewable Energy" anywhere in the liquidated damages provisions and highlights several clauses consistent with an exclusive focus on RECs. First, section 4.04(d), quoted above, contains a mechanism for FPL to deliver RECs from another source if FPL cannot produce the RECs at its own facilities. That provision deals only

13

with RECs, and not electricity. Second, the Deficiency Rate is tied to the PUC's substantive rules on REC penalties. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(o)) (Pub. Util. Comm'n of Tex.). The PUC rules impose penalties for failure to retire sufficient RECs, not for failure to deliver electricity. *Id.* Third, the Indian Mesa contract more clearly limits the liquidated damages provision to RECs by eliminating the entire provision in the event that RECs cease to exist. For the reasons below, we hold that the liquidated damages clauses apply only to RECs.

At the outset, we note that sophisticated parties have broad latitude in defining the terms of their business relationship. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex. 2008) (articulating the principle that Texas courts should uphold contracts "negotiated at arm's length by 'knowledgeable and sophisticated business players' represented by 'highly competent and able legal counsel'" (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997)). We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012); *see also Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.) ("In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose."). Therefore, the lack of reference to electricity or energy in the liquidated damages provisions is critical.

Where the parties intended to address both energy and RECs, the contracts do so. In section 4.02, the payments are based on "all RECs and Net Energy produced by [FPL]." Section 4.03

14

contains explicit references to section 4.02 and the payments under section 4.02. The liquidated damages provisions, in contrast, provide no such reference. We will not, as TXUPM urges, selectively import terms from other provisions to compensate for the absence of the term "energy"; rather, we conclude that the omission was intentional and deliberate. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

This interpretation does not conflict with, or render meaningless, any other provision of the contracts. To the contrary, other provisions recognize that RECs often receive differential treatment. Section 3.03(b) provides that if TXUPM cannot take delivery of electricity, FPL may sell electricity to the Connecting Entity, but must then sell the REC so produced to TXUPM. Section 4.04(d) allows FPL to cover REC deficiencies with RECs from other sources. These distinctions make sense because an electricity provider may readily obtain RECs on the open market, whereas it is more difficult for providers to arrange for substitute electricity to meet their commitments.

Support for differential treatment of RECs also flows from the regulatory scheme incorporated by reference into the contracts. Section 4.04(f) incorporates a Deficiency Rate from the PUC rules, then found in Texas Administrative Code Title 16, section 25.173. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(o)) (Pub. Util. Comm'n of Tex.). Section 25.173, at the time of contracting, assignment, and breach, contained a mechanism for excusing REC deficiencies due to events "beyond [the] reasonable control of the provider." *Id.* Such events

15

included lack of transmission capacity or curtailment orders from ERCOT. *See id.* (former 16 TEX. ADMIN. CODE § 25.173(o)(4), (5)). The contracts incorporate this mechanism through section 4.05, which reduces the Annual Quantity to the extent that Administrative Code section 25.173 excused penalties for REC deficiencies. In sum, the contracts reduce FPL's REC obligations when the PUC provides an excuse for the deficiency.

The very inclusion of the Deficiency Rate, which reflects the *actual* penalty TXUPM would have to pay for a REC deficiency, suggests the liquidated damages clause was intended to compensate only for REC deficiencies. To underscore this point, we note that when the parties entered the contracts, TXU Electric was subject to regulatory penalties for REC deficiencies. *See id.* (former 16 TEX. ADMIN. CODE § 25.173(c)(1)). If FPL failed to deliver both electricity and RECs, and TXU Electric consequently could not meet its REC requirements, the PUC would assess a penalty against TXU Electric. The liquidated damages clause would yield $50 per REC, or the equivalent of the regulatory penalty. This would compensate TXU Electric for the undelivered REC, but what about the undelivered electricity? Liquidated damages would provide no compensation to TXU Electric for FPL's failure to deliver electricity. This belies TXUPM's assertion that the provisions were intended to compensate for both RECs and electricity. We conclude that the liquidated damages clauses compensate for REC deficiencies and leave common law remedies available for electricity deficiencies.

The Indian Mesa contract further solidifies our interpretation. Section 10.02 of the Indian Mesa contract provides that "if RECs cease to exist, then Section 4.03 and Section 4.04 of this Agreement will be automatically deleted." This section preserves the agreement as an electricity-

16

only contract if RECs disappear. Because the liquidated damages provision becomes a nullity without RECs, we must conclude that the provision is intended to compensate only for REC deficiencies. To do otherwise would render the provision meaningless, and this we cannot do. *See Coker*, 650 S.W.2d at 393.

Limiting the liquidated damages provisions to their plain language also has the benefit of advancing stability in the renewable energy marketplace, including the vital role of RECs. Under the legislative scheme, RECs and energy are "unbundled." TEX. UTIL. CODE § 39.904(b); ERCOT Nodal Protocols § 14.3.2(1) (January 1, 2013). Electric providers may either generate their own renewable energy or purchase RECs on the open market. 16 TEX. ADMIN. CODE § 25.173(d), (l). Though FPL and TXUPM chose to contract for both in this case, we should not allow that fact to cloud our analysis. As amici curiae REC stakeholders have pointed out, a contrary holding could impede the REC market, which facilitates renewable energy development by allowing prospective electric producers to secure a guaranteed long-term revenue stream. Yet if, as TXUPM urges, "REC" does not mean only REC, substantial uncertainty may arise regarding the desirability of such investments, the meaning of existing contracts, the negotiation of future contracts, and the ease of regulatory compliance. We are loath to interfere with a functioning market when the language of the contracts does not so require.

The plain language of the liquidated damages provisions, the differential treatment of RECs and electricity in the contracts, and the separate provisions of the Indian Mesa contract all support a limited interpretation of a REC. We hold that the liquidated damages provisions apply only to REC deficiencies.

17

### III. Enforceability of Liquidated Damages

We next consider the enforceability of the liquidated damages provisions when applied only to RECs. FPL contends that the provisions impose an unenforceable penalty when applied to compensate only for REC deficiencies. Although TXUPM argues primarily that the provisions reasonably forecast damages for electricity *and* RECs—a position foreclosed by our holding in this case—TXUPM's arguments regarding the difficulty of estimation of REC-based damages and the reasonableness of the forecast of damages still resonate. Because the liquidated damages provisions fail our test for enforceability, however, we hold the provisions unenforceable.

The basic principle underlying contract damages is compensation for losses sustained and no more; thus, we will not enforce punitive contractual damages provisions. *See Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952). In *Phillips v. Phillips*, we acknowledged this principle and restated the two indispensable findings a court must make to enforce contractual damages provisions: (1) "the harm caused by the breach is incapable or difficult of estimation," and (2) "the amount of liquidated damages called for is a reasonable forecast of just compensation." 820 S.W.2d 785, 788 (Tex. 1991) (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 n.2 (Tex. 1979)). We evaluate both prongs of this test from the perspective of the parties at the time of contracting.[2] In *Phillips* we recognized that, under this test, a liquidated damages provision

---

[2] *Polimera v. Chemtex Envtl. Lab., Inc.*, No. 09–10–00361–CV, 2011 Tex. App. LEXIS 3886, at *12 (Tex. App.—Beaumont May 19, 2011, no pet.) (mem. op.); *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991, no writ); *Mayfield v. Hicks*, 575 S.W.2d 571, 576 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.)*; Muller v. Light*, 538 S.W.2d 487, 488 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.); *Schepps v. Am. Dist. Tele. Co. of Tex.*, 286 S.W.2d 684, 690 (Tex. Civ. App.—Dallas 1955, no writ); *Zucht v. Stewart Title Guar. Co.*, 207 S.W.2d 414, 418 (Tex. Civ. App.—San Antonio 1947, writ dism'd); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981) (identifying the time of making a contract as the moment to evaluate the reasonableness of a liquidated damages clause).

may be unreasonable "because the actual damages incurred were much less than the amount contracted for." 820 S.W.2d at 788. A defendant making this assertion may be required to prove the amount of actual damages before a court can classify such a provision as an unenforceable penalty. *Id.* While the question may require a court to resolve certain factual issues first, ultimately the enforceability of a liquidated damages provision presents a question of law for the court to decide. *Id.*

## A. Difficulty of Estimating Damages

We first consider the difficulty of estimating damages at the time of contracting. TXUPM emphasizes the uncertainty of the market for RECs. FPL counters that all parties knew a REC marketplace would soon exist and provide transparent pricing by the time the obligations under the contracts became due. We agree with TXUPM that damages for RECs were difficult to estimate at the time of contracting.

The implementing legislation for the REC scheme passed in 1999, Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, sec. 39.904, 1999 Tex. Gen. Laws 2543, 2598–99, but at the time of contract formation in 2000, the market for RECs did not yet exist. The nature of FPL's obligation compounded the difficulty. The contracts required FPL to deliver an annual quantity of RECs. TXUPM could not identify the specific time, and thus the spot price in the REC market, in order to calculate the damage for any specific REC deficiency. Even if the contracts anticipate a healthy marketplace for RECs, the uncertain success of a novel legislative scheme surely poses a challenge to predicting damages. Indeed, as explained previously, the Indian Mesa contract foresaw the potential disappearance of the REC scheme and provided for continuation of the contract in the

19

event of the scheme's demise. The uncertain marketplace for RECs suffices to meet the "difficulty of estimation" prong of the contractual damages test.

## B. Reasonableness of Damage Forecast

We next turn to the second prong, the reasonableness of the forecast of damages. FPL argues that the liquidated damages provisions, which derive directly from the regulatory penalty scheme, impose the maximum penalty in all situations. FPL points to an ameliorative provision in the penalty regulations that excuses REC deficiencies due to lack of transmission capacity or the actions of a governmental authority, such as an ERCOT curtailment. *See* 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(o)) (Pub. Util. Comm'n of Tex.). Many of TXUPM's counter-arguments are inextricably tied to contractual damages provisions based on RECs and electricity, and we need not acknowledge those arguments here. TXUPM does assert, however, that the liquidated damages provisions were not intended as indemnity clauses and therefore are not limited to application only if TXUPM were actually assessed a penalty.

We view the reasonableness of the forecast from the time of contracting. *E.g.*, *Mayfield v. Hicks*, 575 S.W.2d 571, 576 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981) (identifying the time of making a contract as the moment to measure the reasonableness of anticipated loss). We are not persuaded, as FPL urges, to attach a "penalty" label merely because the liquidated damages clause derives from a "penalty" scheme; that does not, standing alone, make it a penalty. *Stewart*, 245 S.W.2d at 486 ("[T]he courts will not be bound by the language of the parties.").

20

Although the initial per-REC deficiency rate is $50, the contracts also provide:

> To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC].

The contracts thus anticipate that the amount of damages may be tied to market value, rather than an arbitrary number. Further, section 4.05 of the contracts anticipates that the PUC substantive rules will affect the REC requirements:

> The exception . . . is that the Annual Quantity for a year is decreased to the extent that [TXUPM] is excused from paying a penalty by reason of any event under Section 25.173(o)(4) and (5) of the [PUC] Substantive Rules that adversely affected production of RECs by the Renewable Resource Facility in that year.

As discussed above, former PUC rules, then found in Title 16, Section 25.173 of the Texas Administrative Code, excused REC deficiencies due to lack of transmission capacity or curtailment orders. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former 16 TEX. ADMIN. CODE § 25.173(o)) (Pub. Util. Comm'n of Tex.). The contracts therefore contemplate that REC obligations of the parties, and the resulting damages, are a product of and intertwined with the regulatory scheme. The liquidated damages provisions attempt to integrate these ameliorative processes, and thus, on their face, reasonably forecast damages.

Yet the facts of this case demonstrate the chasm between the liquidated damages provisions as written and the result of the provisions under the court of appeals' judgment. First, the number of deficient RECs varies significantly between TXUPM's assertion and what the regulatory scheme would indicate. FPL had a collective deficiency of 580,000 RECs, yet 62% (or about 360,000) were

21

not produced because of transmission congestion and associated ERCOT curtailment orders, which are excused by the PUC rules. *Id.* TXU Electric was subject to PUC penalties for REC deficiencies at the time of contract formation. *Id.* (former 16 TEX. ADMIN. CODE § 25.173(c)(1)). Upon assignment to TXUPM, a power marketer, no party was subject to PUC penalties. *See* 16 TEX. ADMIN. CODE § 25.5(83) (defining power marketer as an wholesaler seller of electricity who does not own generation, transmission, or distribution facilities in Texas, which would exclude TXUPM from REC penalties). This change in relationship did not undermine each contract, but it fundamentally changed the basis for the liquidated damages provisions. Those provisions presuppose that TXU Electric or its successors would respond to potential penalties for REC deficiencies. When those successors have no REC penalty obligations, they may, as occurred here, fail to secure a regulatory excuse for deficiencies that would obviate any need for the liquidated damages provisions. If the PUC could assess a penalty against TXUPM, the penalty would be based on the 220,000 RECs attributable to lack of wind, not congestion.

Second, the Deficiency Rate calculation failed to tie the damages to market value as the contracts contemplate. Section 4.04(f) of the contracts allows for a Deficiency Rate of either $50 or twice the annual average market value of RECs "[t]o the extent that the [PUC] determines the annual average market value." The PUC expressly declined TXUPM's request for such a determination. The actual market value of a REC during the period in question ranged from $4 to $14. The fortuity of a PUC determination thus utterly controls the damages, irrespective of the actual market value. For instance, the appropriate amount of damages should fall in the range of $8

22

to $28 (twice the average market value), depending on what the PUC would have determined as the actual market value of a REC in each year.

In combination, this creates an unacceptable disparity. The court of appeals assessed damages at $29 million. If we use the REC deficiency of 220,000 (as reduced under PUC rules), and the reduced Deficiency Rate of $28 (the upper bound of the possible range), actual damages equal only $6,160,000. To reach damages of $29 million on a 220,000 REC deficiency would require an effective deficiency rate of $132 per REC. The disparity grows if we consider that TXUPM also avoided the contract price of $24 per MWh of Renewable Energy—which includes a REC and a MWh of electricity. Although only a portion of the $24 is attributable to the REC not purchased, it nonetheless would further diminish TXUPM's actual damages. In *Phillips*, we recognized that a liquidated damages provision may be unreasonable in light of actual damages. 820 S.W.2d at 788. The burden of proving unreasonableness falls to FPL. *See id.* The court of appeals held that FPL failed to meet this burden, yet the court's evaluation was based on evidence of damages for electricity *and* RECs. 328 S.W.3d at 589–90. Our holding on the scope of the liquidated damages clauses limits our consideration to damages for REC deficiencies. The evidence reviewed in this opinion demonstrates that FPL has met its burden.

*Phillips* did not create a broad power to retroactively invalidate liquidated damages provisions that appear reasonable as written. *See* 820 S.W.2d at 788. Nor do we create such a power here. But when there is an unbridgeable discrepancy between liquidated damages provisions as written and the unfortunate reality in application, we cannot enforce such provisions. The forecast of damages was flawed by its reliance on events that did not and perhaps cannot occur—a

23

PUC determination of the market value of RECs and a failure to secure a regulatory excuse for curtailment-based REC deficiencies. When the liquidated damages provisions operate with no rational relationship to actual damages, thus rendering the provisions unreasonable in light of actual damages, they are unenforceable. *See id.* Because the liquidated damages provisions operate as a penalty, we hold the provisions unenforceable.

## IV. Conclusion

We hold that the contracts do not require TXUPM to provide transmission capacity to FPL, and thus TXUPM did not breach the contracts. FPL may owe damages for its breach, but the liquidated damages provisions in the contracts are unenforceable as a penalty. Accordingly, we reverse in part the judgment of the court of appeals and remand the case to the court of appeals to determine damages consistent with this opinion.

_____
Paul W. Green
Justice

OPINION DELIVERED: March 21, 2013

24